

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-13-00043-CR

PAUL MCGREGOR                                                    APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

## FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Paul McGregor appeals his conviction for indecency with a child by contact. In one issue, McGregor argues that the trial court erred by allowing the State to introduce a video of complainant Stepdaughter's forensic interview. The State concedes that it was error for the trial court to allow the video in

---

[1]See Tex. R. App. P. 47.4.

evidence. But because we conclude that the error did not harm McGregor, we will affirm.

## II. BACKGROUND

Disturbed by an entry in Stepdaughter's diary, Mother confronted Stepdaughter as to why she had written, "All I got to do is hit up [McGregor,] and he has no choice but to do what I say. Sorry, Daddy Dear, but blackmail is a bitch, ain't it?" Initially, Stepdaughter claimed the entry was "nothing," but as Mother continued to question her, Stepdaughter eventually broke into tears and said that McGregor had told Stepdaughter sexually explicit stories about himself and that "[McGregor] made [her] touch him." The next day, Mother went to the district attorney's office, which connected her with Denton Police Officer David Bearden.

Bearden testified at trial that after scheduling and observing Stepdaughter's forensic interview, he arranged multiple "spoof" calls wherein both Stepdaughter and Mother would call McGregor and elicit responses from him that might incriminate him or otherwise corroborate Stepdaughter's outcry. These phone conversations were recorded. Bearden averred that Stepdaughter made the first call and that he had coached Stepdaughter to "Basically [say], [McGregor], we're caught." During Stepdaughter's first call, Bearden said that immediately after she described to McGregor that Mother had found her diary and that she had written "what he had been doing to her," the first words out of McGregor's mouth were, "Oh, my God." Bearden said that this response was

2

significant to him because it "made it appear that [McGregor] knew exactly what [Stepdaughter] was talking about." Even more significant to Bearden than McGregor's statement was that Stepdaughter never said exactly what she had written in her diary.

Bearden said that McGregor "kept telling [Stepdaughter] that he couldn't believe that she would write something like that in her diary." Furthermore, according to Bearden, Stepdaughter told McGregor in the phone conversation that she would attempt to appease Mother's concerns with a "story" but that if Mother believed Stepdaughter's story, McGregor "can't do this anymore to her." McGregor responded, "I know."

Bearden then had Mother call McGregor and tell him that she had just heard from Stepdaughter that McGregor had molested her. By Bearden's account, during this phone conversation, McGregor acted as if he had not received the earlier phone call from Stepdaughter and at one point in the conversation declared that he was "caught off guard" by Mother's phone call and accusations. Bearden described McGregor's contrasting demeanor between the phone calls: "Yeah, he was friendly with [Stepdaughter]. He was . . . agitated with [Mother]."

Later, during his investigation, Bearden again had Stepdaughter call McGregor. In that call, Bearden said that McGregor told Stepdaughter to tell Mother that she had made up what she had written in her diary and that he had not done what she had written. Much like the earlier calls, McGregor's

3

statements stood out to Bearden because "[McGregor] still did not know what [Stepdaughter had written] in her diary."  McGregor also told Stepdaughter during the call that if she did not lie to Mother, he would go to jail and their family would be "destroyed."

Bearden testified that during both of Stepdaughter's spoof calls, McGregor sought assurance from Stepdaughter that Mother was not around while they were talking and he requested that she delete these calls from her phone log so that Mother "won't know."  The audios of these phone conversations were played for the jury.

Bearden said that during his investigation, he acquired surveillance footage from a self-storage facility, a place where Stepdaughter said that an act of indecency occurred.  The surveillance footage corroborated Stepdaughter's outcry that she and McGregor had gone to the storage facility, entered the storage unit, and then exited within minutes.  The footage showed that McGregor did not take anything in or out of the unit, and it also showed Stepdaughter attempting to jump and hit an exit sign with her hand.

Bearden testified that he and a fellow officer also searched areas of the family's home.  According to Bearden, the officers focused their search on areas of the home where Stepdaughter alleged that McGregor had routinely molested her.  Consistent with Stepdaughter's forensic interview in which she said that sometimes McGregor would ejaculate onto his T-shirts and throw them in his closet, Bearden found multiple T-shirts in McGregor's closet that had McGregor's

4

semen on them. Pictures of the closet and the T-shirts containing visible stains were displayed to the jury. Also consistent with Stepdaughter's forensic interview, in which she averred that McGregor would sometimes use condoms during the abuse and also watch pornography, Bearden found boxes of condoms, opened condom wrappers, and pornographic videos in McGregor's closet. Verizon Communications' records also showed that someone in McGregor's home purchased X-rated movies. Some of the titles to the pornographic movies were "Bring 'Em Young" and "He is My Stepdad 2."

Registered Nurse Lucrecia DeLawter testified that she conducted a sexual assault exam of Stepdaughter. The State introduced the medical records associated with the exam and had DeLawter read portions of her notes to the jury. In her notes, DeLawter recorded that Stepdaughter said that McGregor had touched her with his hands on her "breasts, butt, and vagina" with her clothes on and off. She also told DeLawter that McGregor had "rubbed" Stepdaughter's vagina "but didn't put his fingers in." According to DeLawter's notes, Stepdaughter said that these things happened in her room, in the family room, in the game room, and in McGregor's storage unit.

The notes also revealed that Stepdaughter told DeLawter that McGregor had put his penis in her mouth, that he had ejaculated in her mouth, and that McGregor "made [her] swallow his" ejaculate. Stepdaughter reported that the "next time [she] spit it out." DeLawter's notes also stated that McGregor would

5

sometimes ejaculate on Stepdaughter's back or face when she would refuse to swallow his ejaculate and that at other times, McGregor would wear a condom.

DeLawter's notes reflected that McGregor would make Stepdaughter touch his penis when he would drive and that on more than one occasion he had penetrated Stepdaughter's anus with his penis. Stepdaughter told DeLawter that these incidents "hurt," so she would move away, and that McGregor would instead put his penis between her thighs.

Mother testified that she and McGregor occasionally used condoms during intercourse but that they were in her closet and not his. She stated that she "found it strange [that McGregor] had almost a store full of condoms in his closet, several boxes." She also testified that McGregor watched "too much" pornography. Mother averred that McGregor would frequently give more money to Stepdaughter than to Brother or Sister.

Brother also testified that McGregor would give more money to Stepdaughter than him and that McGregor would buy Stepdaughter more gifts than him, so much so that it was noticeable. Brother averred that when McGregor would come talk to him, McGregor would leave Brother's bedroom door open. When McGregor would talk to Stepdaughter, however, McGregor would close her bedroom door. Brother specifically testified that when Stepdaughter would get into "trouble," McGregor would go to Stepdaughter's room, close the door, and then when he came out, Stepdaughter would no longer

6

be in trouble. Brother said this scenario played out often and that he found it odd.

Sister testified that over time, McGregor would buy Stepdaughter more gifts than the other siblings and that McGregor was lenient toward Stepdaughter such that she was allowed to be "snappy" to McGregor. Like Mother and Brother, Sister noticed that McGregor gave Stepdaughter more money than the siblings. By Sister's account, the three children slept in the family game room the night Stepdaughter had revealed the abuse to Mother. Sister said that on that night, Mother asked her if McGregor had ever touched her inappropriately and Sister told Mother that McGregor never had. She also testified that she believed Stepdaughter and that on that night, she "slept with a knife under [her] pillow."

Stepdaughter testified that she could not remember a time when she did not consider McGregor her "dad," even though he was technically her stepfather. Stepdaughter said that the first time she remembered McGregor "molesting" her was just prior to returning to school as she entered the eighth grade—she was thirteen years old. She said that one evening she walked by McGregor and he "slapped [her] on [her] butt." She said that right after that, the two went downstairs and were on the couch when McGregor started to rub her inner thigh. Stepdaughter said that she shifted around some, disbelieving what was occurring and thinking that perhaps McGregor was kidding or unaware of what he was doing. Instead of stopping, McGregor progressed to rubbing his hand over her

genitals. Stepdaughter said that she "kind of brushed it off and didn't really say anything about it."

Stepdaughter said that the next event she remembered entailed the family watching a movie together. According to Stepdaughter, she fell asleep during the movie, but she awoke to McGregor "putting his finger in [her] mouth," everyone else but her and McGregor had gone to bed, and McGregor was watching a "sex scene" in a different movie than the one they had been watching. McGregor told her to "suck" his finger. Stepdaughter said she repeatedly refused but that McGregor insisted so she eventually did. From there, McGregor took Stepdaughter to the nearby bathroom, instructed her to get on her knees, and McGregor "put [her] mouth on his genitals." Stepdaughter said that on this occasion, McGregor ejaculated into the toilet, instructed her not to tell Mother, and then went to bed.

Stepdaughter said that McGregor would routinely come to her bedroom under the auspice that he was massaging her legs due to fatigue from volleyball, but that he "would try to finger [her] or touch [her] inappropriately." She testified that on a number of occasions, McGregor would check to ensure that everyone else in the house was "preoccupied" and then would come to her room, close the door, make her pull her pants down as he pulled his down, "and he would put [his penis] between [her] legs, and he then would make [her] put it in [her] mouth." Stepdaughter testified that when he would put his penis between her legs, his

8

penis would be "[t]ouching [her] vagina but not in it," and he usually did this after requiring her to get "on all fours" or after bending her over "a bed or a couch."

Stepdaughter said that these incidents most often ended with McGregor ejaculating either on her face, back, or stomach. Other times, McGregor would lay out a shirt and ejaculate onto the shirt because Stepdaughter "didn't like to have that in [her] mouth." Stepdaughter estimated that McGregor ejaculated into shirts approximately twenty times during the several months the abuse occurred. Stepdaughter said that sometimes McGregor would simply toss the used shirts into his closet. Stepdaughter averred that "[t]owards the end of the abuse, McGregor actually started to" use condoms.

Stepdaughter said that McGregor acknowledged to her that what he had been doing was wrong and that he would often say that he would stop, "[b]ut the next day he continued to do it." Stepdaughter said that McGregor told her that if she revealed the abuse to Mother, the result would be that McGregor and Mother would get divorced. She interpreted this statement as a threat to make her continue cooperating in the abuse.

According to Stepdaughter, McGregor began to buy her gifts and give her money after the abuse started. She testified that she thought of these things as "hush money." Stepdaughter also described that McGregor had attempted numerous times to have vaginal intercourse with her but that she would pull away and threaten to tell Mother if he attempted to again. On two occasions, McGregor penetrated her anus with his penis. Stepdaughter said that "[i]t hurt a

9

lot" when he penetrated her anus. Other times, McGregor would put his thumb in her anus. Stepdaughter said that the abuse became almost "a daily thing."

Stepdaughter recalled an event when McGregor took her to his storage unit after her volleyball practice. Stepdaughter said that McGregor took her into the unit, pulled her shorts down, placed his penis between her legs, and "just kind of thrusted . . . like, grinding, and then [he] was done." Stepdaughter said that she remembered that as they left, "there was an [e]xit sign, and [she] jumped up and touched it." She said that because of the event, she had red hand marks on her legs and that McGregor "stalled" on their drive home so that the redness would subside before they arrived.

Stepdaughter also testified that McGregor would often take her with him when he would go to pick Sister up from work, but before getting Sister, "[h]e would drive around or to a dark part of the parking lot and make [her] give him oral sex." Stepdaughter said that McGregor would often touch her breasts, but that "it wasn't anything [she] focused on because [she] felt it wasn't as extreme as everything else going on." As to him touching her breasts, Stepdaughter recalled a specific time when she, McGregor, and her brother were driving home, she and Brother had fallen asleep, and she awoke to McGregor putting his hand under her shirt and grabbing her breast. She said that she remembered that specific time because his hands were cold and they were near Lake Dallas High School.

10

Later in the trial, the State called Rebecca Truette, the forensic interviewer who conducted Stepdaughter's outcry interview. Truette testified that Stepdaughter explained in the interview how McGregor began grooming her by complimenting her, with the abuse progressing to inappropriate touching and sexual stories. Truette said that Stepdaughter talked about the gifts that McGregor would buy her and how the effect of such gifts was to make Stepdaughter feel "almost as guilty" as McGregor about the abuse. Truette also said that the interview revealed that the abuse became so continual and frequent that Stepdaughter became "very desensitized" to the abuse. Over McGregor's objection, the trial court allowed the State to introduce the video of the forensic interview and play it for the jury.

McGregor testified that he loved all three of Mother's children and that he considered all of them to be his own, including Stepdaughter. McGregor, however, averred that Stepdaughter began to develop "attitude" toward the end of elementary school. By McGregor's account, Stepdaughter was often in trouble at home and at school. McGregor testified that Stepdaughter lied about numerous things because she was bent on getting her way and that everyone in the family knew that she lied frequently.

McGregor said that he did not tolerate Stepdaughter's "defiant" behavior and that it was untrue that he lavished more gifts and money on Stepdaughter than her siblings. McGregor averred that he did watch pornography and that he had purchased the condoms in his closet "throughout the years," but he said that

11

they were used only between him and Mother or by himself when he would masturbate.

McGregor testified that he knew that Mother had told Stepdaughter not to call him and that was the reason he told her to delete the phone calls from her call log. He also denied all accusations that he had been inappropriate with Stepdaughter. McGregor said that he had gone to the storage unit briefly to check his inventory on the day the surveillance cameras captured Stepdaughter jumping up and hitting the exit sign and that is why he did not take anything there or bring anything out.

McGregor testified that he "had no idea what [Stepdaughter] was talking about" when she said in the first police-arranged phone conversation, "We can't do that anymore." He also said that he did not remember responding, "I know." As to the second call from Stepdaughter, McGregor also could not recall the exchange in which Stepdaughter asked if it would be alright to tell "minor stuff" and McGregor could be heard saying, "No, don't tell [Mother] nothing" . . . "if you haven't told her."

Of the two counts the State charged McGregor with, the jury returned a verdict of guilty as to the charge of indecency with a child by contact by way of touching her breast, but it returned a verdict of not guilty as to the charge of continuous sexual abuse of a young child. The jury assessed punishment at ten years' imprisonment and a $10,000 fine. The trial court entered judgment accordingly and this appeal followed.

12

### III. DISCUSSION

In his sole issue, McGregor argues that the trial court abused its discretion by allowing the State to introduce the video of Stepdaughter's forensic interview and that the introduction of the video was harmful. The State concedes that the trial court abused its discretion by allowing it to introduce the video. *See Bays v. State*, 396 S.W.3d 580, 592 (Tex. Crim. App. 2013) ("[W]e conclude that [the] outcry statute does not permit admission of video-recorded statements of a complainant."). The State argues, however, that the video "essentially repeated testimony" of Stepdaughter and the other witnesses and therefore was not harmful. We agree with the State that the trial court erred by admitting the video of Stepdaughter's forensic interview in evidence but that McGregor was not harmed by its admission. *Id.*

McGregor spends the lion's share of his harm analysis arguing that the video improperly "bolstered" Stepdaughter's testimony. But McGregor never objected to the video introduced at trial under the theory of bolstering. *See Washington v. State*, 771 S.W.2d 537, 544 (Tex. Crim. App.) (reasoning that because defendant did not object to any testimony on the ground of bolstering, no error was preserved for appellate review), *cert. denied*, 492 U.S. 912 (1989). Thus, to the extent that McGregor is attempting to bring an error based on improper bolstering, we overrule this portion of his sole issue.

McGregor's argument that the introduction of the video harmed him is predicated on his erroneous position that "the *only* evidence implicating" him

came from Stepdaughter's testimony. That is simply not the case. Indeed, the State elicited incriminating testimony from Bearden, DeLawter, Mother, Brother, and Sister. The State also played audio of the three "spoof" calls by Stepdaughter or Mother and introduced other physical evidence corroborating Stepdaughter's testimony to specific events.

The erroneous admission of a hearsay statement constitutes non-constitutional error that is subject to a harm analysis. *See* Tex. R. App. P. 44.2(b); *see also Campos v. State*, 317 S.W.3d 768, 779 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (*citing Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

Under rule 44.2(b), we disregard the error if it did not affect McGregor's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (*citing Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d at 417.

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the

nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

Here, the inadmissible video contained evidence that was duplicative of Stepdaughter's properly admitted testimony. *See Dunn v. State*, 125 S.W.3d 610, 615 (Tex. App.—Texarkana 2003, no pet.) ("The cases uniformly hold that the rule is that the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence."). The contents of Stepdaughter's testimony and the statements she made during the forensic interview were additionally introduced without objection through the testimony of Bearden, Mother, DeLawter, Truette, Brother, and Sister. Stepdaughter's testimony as well as DeLawter's notes that were introduced detailed almost identically the contents of the videotaped forensic interview. Furthermore, the State introduced three incriminating audio portions of the phone calls in which McGregor can be heard telling Stepdaughter to lie to Mother about what had transpired, to delete the calls between himself and Stepdaughter so that Mother would not know the calls had been made, and an acknowledgment to Stepdaughter that he knew that he could no longer do what he had been doing to her. These calls are all the more condemning to McGregor because he did not

15

know what Stepdaughter had written in her diary, and yet he repeated exclaimed to her "Why would you write that?" There is even a colloquy in the third phone call where McGregor instructs Stepdaughter that she cannot even reveal the "minor stuff." In the second phone call, which is between Mother and McGregor, McGregor conducts the conversation as if Stepdaughter had not previously called him.

The State also introduced physical evidence corroborating Stepdaughter's testimony. Consistent with Stepdaughter's testimony that McGregor would ejaculate onto shirts and discard them in his closet, the State introduced multiple photographs and forensic evidence of T-shirts found in McGregor's closet that contained semen stains consistent with McGregor's DNA. McGregor testified himself that it was his semen on these T-shirts. The State also introduced evidence that, unknown to Mother, McGregor had numerous condoms in his closet, including opened condom packages. This evidence is consistent with Stepdaughter's testimony that McGregor would sometimes wear condoms when he performed indecent acts with her.

The State also introduced evidence by way of surveillance video placing McGregor and Stepdaughter at the self-storage facility. The video depicts the scene almost identically to Stepdaughter's testimony. The State also introduced evidence that McGregor had a fascination with pornography, part of his collection of pornography involved sexual activities with young teenaged girls, and he

16

watched pornography containing sexual activity between stepfathers and stepdaughters.

We conclude that in the context of the entire case against McGregor, the trial court's error by admitting the video of Stepdaughter's forensic interview did not have a substantial or injurious effect on the jury's verdict and did not affect McGregor's substantial rights. *See Chapman v. State*, 150 S.W.3d 809, 814–15 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (holding improper admission of outcry testimony was harmless where similar testimony was admitted through complainant and pediatrician); *see also Jiminez v. State*, No. 07-07-0389-CR, 2009 WL 3102010, at *6 (Tex. App.—Amarillo Sept. 29, 2009, pet ref'd) (mem. op., not designated for publication) ("In situations where an improperly admitted videotape [essentially repeats] the victim's properly admitted testimony on the same issue, courts often disregard the error reasoning that it could not have affected the appellant's substantial rights."). Thus, we disregard the error and overrule McGregor's sole issue in its entirety. See Tex. R. App. P. 44.2(b); *see also King*, 953 S.W.2d at 271.

## IV. CONCLUSION

Having overruled McGregor's sole issue, we affirm the trial court's judgment.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  May 15, 2014

18